# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**UNITED STATES OF AMERICA
ex rel., SUZANNE BALKO, Relator,**

        **Plaintiff,**

**v.**                                                     **Case No. 8:13-cv-3072-T-17TBM**

**SENIOR HOME CARE, INC.,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on referral for the purpose of conducting a fairness hearing and determination regarding the proposed settlement agreement, pursuant to 31 U.S.C. § 3730(c)(2)(B).  (Doc. 104).

The United States, intervenor in this action, filed a copy of the proposed settlement agreement.  (Doc. 114).  In addition, the parties have submitted memoranda in support of their respective positions on the proposed settlement.  (Docs. 123–125).  A fairness hearing was conducted February 9, 2017, with a follow-up hearing on February 28, 2017.

### I.

### A.

On December 5, 2013, Relator, on behalf of the United States, filed this *qui tam* action under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, against Defendant Senior Home Care (SHC).  The United States filed a notice of election declining intervention on October 23,

2014 (Doc. 10), and the case was unsealed (Doc. 11).  In February 2016, Relator filed an Amended Complaint.  (Doc. 44).

By her Amended Complaint, Relator, a registered nurse and field clinician for SHC from July 2009 through September 2011, alleges that SHC, a Medicare-certified home health agency (HHA), defrauded the United States by presenting false claims for payment of wound care treatment through a scheme that fraudulently identified all surgical wounds less than thirty days old as "not healing."  As a field clinician, Relator made home visits to house-ridden patients and conducted initial assessments of their medical condition.  In brief, in order to participate in Medicare home health care and receive benefits for Medicare patients, an HHA is required to encode and transmit to the state agency or CMS an Outcome and Assessment Information Set (OASIS) form.  Within OASIS are data sets that denote things such as the patient's condition, treatment needed, current treatment given, status of treatments, etc.  Depending on which data set is selected, the reporting home health agency receives a higher or lower payment by the SSA. *See id.*

By her allegations, SHC used in-house clinicians to alter OASIS data prepared by the field clinicians without their approval in violation of the reporting requirements of 42 C.F.R. § 484.20.  That Regulation requires that OASIS data accurately reflect a patient's status at the time of the assessment.  Relator alleges that SHC altered a data set called M1342 by requiring in-house clinicians to encode all wounds less than thirty days old as "not healing" without the approval of the field technicians who had visited the patient.  She alleges this ultimately resulted in a higher reimbursement rate from Medicare.  *Id.*

2

In Count One, Relator claims SHC violated 31 U.S.C. § 3729(A) (sic), by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval.  In Count Two, she claims SHC violated 31 U.S.C. § 3729(B) (sic), by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. *Id.*[1]

Throughout the course of the litigation, Relator and SHC engaged in discovery and motion practice.  On June 21, 2016, Relator sought leave to file a second amended complaint under seal.  (Doc. 74).  As grounds to amend, Relator pointed to a recent and belated disclosure of an SHC policy to support new claims.  She asserted that the theory of liability in the Second Amended Complaint is the same theory of liability as set forth in the First Amended Complaint. *Id*. at 7.  The motion was not resolved.[2]

On June 27, 2016, the parties filed a Joint Notice of Settlement, stating that the parties had reached a settlement in principle, that the United States had been notified of same, and asked that the action be stayed or administratively closed for sixty days pending approval of a written settlement agreement.  (Doc. 84).  The district judge entered an Order directing administrative closure.  (Doc. 85).

---

[1] Subsection (a)(1)(A) makes liable any person who presents, or causes to be presented, a false or fraudulent claim.  Subsection (a)(1)(B) makes liable any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729.

[2] The motion to amend was never addressed, and no copy of the proposed second amended complaint appears in the record.  However, SHC argues that the proposed second amended complaint expanded the scope of Relator's theory of liability to include *any similar change* to an OASIS data set, not just changes to the M1342 data set.

3

The next day, Relator filed a motion to reopen the case, which the district judge denied. (Doc. 91).  SHC moved to extend the administrative closure (Doc. 92), and Relator moved again to reopen the case (Docs. 93, 96).

The United States then filed a Notice of Settlement and Notice for Need of Hearing Pursuant to 31 U.S.C. § 3730(c)(2)(B).  (Doc. 98).  The United States also sought leave to intervene.  (Doc. 97).  As grounds for intervention, the Government asserted its opinion that the settlement reached by Relator and SHC in June 2016 is fair, adequate, and reasonable and is in the best interest of the United States.  It seeks to effectuate the settlement over the objection of the Relator.  *Id.*  Over Relator's objections, the Court granted the Government leave to intervene. (Docs. 103, 122).

## B.

The Government and SHC have reached a proposed settlement agreement (Doc. 114-1), for which they now seek judicial approval.

The proposed agreement provides that SHC shall pay to the United States $325,000.00. In exchange for and subject to certain enumerated exceptions, the United States will release SHC from any civil or administrative monetary claim the United States has for the "Covered Conduct" under the False Claims Act, 31 U.S.C. §§ 3729–3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801–3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.  Also, the Relator, for herself and for her heirs, successors, attorneys, agents, and assigns, will release SHC from any civil monetary claim the Relator has on behalf of the United States for the Covered Conduct under the FCA.  (Doc. 114-1 at ¶¶ 1, 2, 3).

4

The Covered Conduct is defined as follows:

> The United States contends that it has certain civil claims against SHC arising from OASIS data items that were changed or altered by SHC in-house clinicians allegedly without the consent of, approval by, or authorization from the SHC field clinician who completed the OASIS form during the period from July 13, 2009 through and including June 30, 2012.

(Doc. 114-1 at ¶ D).

Among other provisions, the proposed agreement provides that upon receipt of payment, the parties shall file a joint stipulation of dismissal of the instant action, and, other than the rights of the Relator to recover reasonable attorneys' fees and costs under 31 U.S.C. § 3730(d), each party shall bear its own legal and other costs incurred in connection with this matter. (Doc. 114-1 at ¶¶ 14, 15).

The proposed settlement agreement explicitly does not resolve the United States and Relator's rights on the issue of the share percentage, if any, that Relator should receive of any proceeds of the settlement of her claim. (Doc. 114-1 at ¶ 5).

Relator objects to the settlement on several grounds. In her brief in opposition to the proposed settlement, she sets out a summary of the case and a detailed argument of her theory of liability. (Doc. 125). She primarily complains that the scope of the "Covered Conduct" is in excess of the scope of the release she sought, is "arbitrary and capricious," and thus unreasonable. Relator argues the Government is releasing SHC from claims in excess of the Amended Complaint; from claims based on documents SHC has refused to disclose; and from claims that neither she nor the Government has any information about and thus no understanding of the extent and scope of the claims in either number or monetary amount. *Id.* at 2–3. In effect, she

argues the Government's settlement releases all false claims made upon any data set from 2009 forward.

In her brief and at oral argument, she argued the proposed settlement should be rejected because the monetary sum is wholly arbitrary.  Relator urges that the agreed-upon sum of $325,000 was merely an arbitrary number that she and SHC arrived at in settlement discussions.  By her argument, it bears no relation to the real damages, which she estimates could exceed $20,000,000.00 in actual damages and civil penalties.  *Id.* at 19.  In agreeing to this sum and the Covered Conduct in the settlement, she argues the Government acted without any independent investigation or appreciation of the full scope of SHC's fraud.  She submits the defined Covered Conduct goes well beyond the documents produced by SHC in discovery and in effect, "gives SHC a free pass without disclosing the extent and scope of the false claims."  *Id.*

She submits that the appropriate standard to apply in evaluating the settlement is that applied to class action settlements.[3]  Under the class action settlement standards, she argues the settlement fails.  She seeks to reopen the case, file a second amended complaint, and pursue discovery to uncover the full extent fraud incurred through changes to OASIS data set made by all in-house clinicians contrary to the Regulations.  (*See* Doc. 125).

In its brief in support of the settlement, the Government fairly lays out the facts and legal issues in contention.  (Doc. 123 at 1–10).  Essentially, the Government argues that Relator's case is tenuous at best and, given the risks of continuing the litigation, the settlement is fair, adequate,

---

[3]She urges the Court look to the following factors: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.  (Doc. 125 at 19–25).

and reasonable.  At hearing, the Government maintained there are legal and factual flaws in Relator's theory of liability which likely would result in a defense verdict were the case taken to trial.  It argues Relator's theory of liability misconstrues the Regulations related to OASIS reporting requirements, but even if her take is correct, the mere violation of a regulatory provision related to OASIS reporting does not automatically result in a submitted claim being false.  By the Government's assessment, Relator has failed to develop proof of any intent to submit false claims and the case was likely to fail.

The Government argues that in the circumstances of this case the settlement agreement serves a valid governmental purpose and is not arbitrary, fraudulent, or illegal.  Due to the precarious position of the Relator's case and the possibility that it could recover nothing if the case went to trial, the Government believes it is in its best interest to settle the case.  Under the *Sequoia*[4] test, it argues the Government need only show a rationally-related governmental interest in its decision to settle.  It claims its litigation risk assessment and the potential financial interest in settlement satisfies this review.

Concerning Relator's objection to the monetary award, the Government agrees there is nothing magical about $325,000, but it denies that it is "arbitrary."  The sum, which was agreed to by Relator, guarantees the Government recovery that it doubts it could obtain if the litigation went to trial.  Thus, it submits that consideration of the certainty of monetary recovery balanced

---

[4]*See U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1144-46 (9th Cir. 1988).  Under the *Sequoia* standard, the Government states it can obtain dismissal over the relator's objection, even if the action is potentially meritorious, provided it articulates how dismissal is rationally related to a legitimate government purpose. *Id.* at 1145.

against the risks of additional litigation provides a reasonable and rational basis to settle the claim.

As for the scope of the Conduct Covered, the Government contends the scope of the release is tied to Relator's own theory of liability.  It argues Relator's concerns over the scope of the settlement do not make it arbitrary, capricious, or fraudulent under the *Sequoia* test.  And, the Government argues including non-M1342 OASIS data sets in the Covered Conduct does not affect the reasonable value of settlement.  Counsel for the Government believes that the Relator's delay in filing a motion to compel and leave to file a second amended complaint made it unlikely that the court would permit Relator to pursue additional or expanded claims.[5]  As a result, it urges that neither the scope of the release nor the amount of the settlement renders the settlement improper.

Even if the class-action standard is applied here, the Government claims that the proposed settlement still passes muster.  First, it argues that Relator is unlikely to prevail at trial.  Combining the second and third factors, it argues the recovery amount is fair, adequate, and reasonable, and within the range of possible recovery.  As to the fourth factor, the complexity of litigation and expense, it submits it would continue to be expensive and time-consuming to continue.  It claims the fifth factor is inapplicable.  Finally, it notes the settlement was achieved

---

[5]Relator complains that SHC's reluctance to turn over discovery and objections to broader discovery hindered her investigation.  Even when pertinent matters were produced, they were produced in an untimely manner.  For example, it waited months before turning over evidence of its policy on OASIS reporting.  Relator claims such should have been provided months earlier.  Moreover, she argues the policy confirms Relator's theory of liability that SHC violated its own rules for OASIS reporting as well as the applicable regulatory provisions.

just days before the close of discovery and the parties had a considerable amount of time to review all the evidence in the case.

SHC also argues in favor of approving the settlement agreement. (*See* Doc. 124). In its brief, it initially complains that Relator agreed to a resolution of the claims to which the government agreed, agreed to filing a joint notice of settlement, and then bowed out the next day. Without saying as much or citing any authority, SHC appears to contend that since the Relator agreed to the settlement she cannot now rescind it because but for Realtor's unreasonable and vexatious conduct, this case could have concluded months ago. SHC argues the settlement should be approved on a finding that it is fair, adequate, and reasonable and constitutes a compromise of disputed claims after a reasonable assessment by the United States of its litigation risks.

SHC argues that the Government is the real party in interest and has the authority to intervene to settle the case over Relator's objections. SHC describes that the proper purpose of the § 3730(b)(2) hearing is not a trial on the merits, but instead serves the limited purpose of forcing the Government to provide some reasoning behind its decision to settle the case and gives the Relator the opportunity to explain why the settlement is not fair, adequate, and reasonable.[6]

Like the Government, SHC urges that Relator's case is tenuous and she is unlikely to prevail on summary judgment or at trial. SHC claims Relator has failed to satisfy the objective falsity prong under the FCA, because she does not establish that the patient's medical records do

---

[6]SHC does not expressly adopt a legal standard by which the Court should determine if the settlement is fair, adequate, and reasonable.

not support a correction to an OASIS data item.[7]  And, it submits if there is no falsity then there can be no valid claim under the FCA.

As for the adequacy of the settlement, SHC argues Relator provides no substantive justification for opposing the settlement other than her desire to obtain a "better" settlement.  It claims that Relator believed that $325,000 was fair, adequate, and reasonable under the circumstances, regardless of the OASIS data set definition, but disagreed with the Government's decision that it would close its investigation and that OIG-HHS was not going to require SHC to enter into a Corporate Integrity Agreement.  Instead, she wished to re-open the case and expand it to include not just M1342 data set, but to all of OASIS.  Finally, despite Relator's assertions to the contrary, SHC argues that Relator was not excluded from settlement discussions and in any event such is not a basis for rejecting the proposed agreement.

## II.

The FCA prohibits the presentment of false claims to the government and the use of false records or statements to get a false claim paid or approved.  The Act may be enforced through civil actions initiated by the Government or suits by private individuals on behalf of the United States.

In pertinent part, the Act provides, "[t]he Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances."  31 U.S.C. § 3730(c)(2)(B).

---

[7]SHC contends that after multiple depositions, Relator was the only field nurse identified who did not agree with corrections made to the M1342 entries.  It asserts no other field clinician supported Relator's allegations.

As discussed above, the parties disagree about the appropriate standard for reviewing an FCA settlement—with Relator advocating adoption of the class action settlement standard and the Government arguing for the more deferential standard articulated in *Sequoia*.  As both parties concede, the Eleventh Circuit has not adopted a standard for determining what is fair, adequate, and reasonable in the context of FCA litigation and settlement.  Indeed, there appears a split of authority on this issue and scant guidance from the appellate courts.

The Ninth and Tenth Circuits have adopted the so-called *Sequoia* standard to evaluate dismissal of *qui tam* cases under 31 U.S.C. § 3730(c)(2)(A).[8]  In *U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1144–46 (9th Cir. 1988), the Ninth Circuit held that the United States need only show a valid purpose or policy for the dismissal, and a rational relationship between the dismissal and the governmental purpose to dismiss a relator's action under section 3730(c)(2)(A).  *Id.*  Once the Government meets this minimal test, the burden shifts back to the relator who can block dismissal only if she shows the proposed dismissal to be fraudulent, arbitrary and capricious, or otherwise in violation of the law.  *Id.*  The Tenth Circuit followed suit in *Ridenour v. Kaiser-Hill Co.,* 397 F.3d 925, 931 (10th Cir. 2005) (adopting the *Sequoia* standard for *qui tam* dismissals).

Notably, this standard was set forth for review of *qui tam* dismissals under 31 U.S.C. § 3730(c)(2)(A), not *qui tam* settlements under 31 U.S.C. § 3730(c)(2)(B).  However, some courts—including some district courts within this Circuit—have extended the *Sequoia* standard

---

[8]This section provides: "The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion."  31 U.S.C. § 3730(c)(2)(A).

to settlements as well.  *See, e.g., United States ex rel. Shepard v. Grand Junction Reg'l Airport Auth.*, No. 13-CV-00736-CMA, 2017 WL 749070, at *2 (D. Colo. Feb. 27, 2017) ("This Court sees no reason why the government should be given such broad discretion to dismiss a case but not to settle it under circumstances that it deems fair, adequate, and reasonable."); *U.S. ex rel. Souza v. Am. Access Care Miami, LLC*, Case No. 11-cv-22686-JAL (S.D. Fla., June 29, 2015); *United States ex rel. Guthrie v. A Plus Home Health Care, Inc.*, Case No. 12-cv-60629-WPD (S.D. Fla. Nov. 5, 2014); *United States v. Ctr. for Diagnostic Imaging, Inc.*, Case No. 05-cv-0058-RSL (W.D. Wash. Apr. 4, 2011); *United States ex rel. Grober v. Summit Med. Grp., Inc., et al.*, Case No. 02-cv-177-JBC-JDM (W.D. Ky. July 9, 2004) (applying a "modified *Sequoia* standard" to settlement agreement, which required the relator to "meet the substantial burden of demonstrating that the settlement is not 'fair, adequate, and reasonable under all the circumstances'").

Other courts have looked for guidance to principles governing judicial review of class action settlements.[9]  *See U.S. ex rel. Nudelman v. Int'l Rehab. Associates, Inc.*, No. 00-cv-1837, 2004 WL 1091032, at *1 n.1 (E.D. Pa. May 14, 2004) (finding, as a matter of first impression, that since Congress borrowed the key language of 31 U.S.C. § 3730(c)(2)(B) from the rule governing judicial review of class action settlements, courts evaluating proposed FCA settlements should apply the same factors they use in evaluating proposed class action settlements); *U.S. ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.*, No. 04-cv-3088, 2009 WL 637137, at *2 (S.D.N.Y. Mar. 5, 2009) (following the *Nudelman* approach); *United States ex rel. Schweizer v.*

_____

[9]Federal Rule of Civil Procedure 23 provides that if a settlement proposal "would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

*Oce North America*, 956 F.Supp.2d 1, 11 (D.D.C., July 19, 2013) (applying the class action standard at the request of both parties, but explaining, "The hearing guaranteed to plaintiff-relators ... serves a more limited purpose of forcing the government to provide some reasoning behind its decision to settle the case and giving plaintiff-relators an opportunity to direct the court's attention to facts or allegations that would suggest the settlement was not 'fair, adequate and reasonable under all the circumstances,' for instance, collusion between the government and the defendant, or significant and unexplained discrepancies between the strength of plaintiffs' case and the settlement.").

In evaluating proposed class action settlements, the Eleventh Circuit directs that the court make findings of fact that there was no fraud or collusion in arriving at the settlement and that the settlement was fair, adequate and reasonable, considering: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011).

## III.

By my consideration, under either standard—the deferential *Sequoia* standard or the Eleventh Circuit's class action settlement standard—the proposed settlement agreement should be approved.[10]

### A.

First, I find the Government has satisfied its burden under the *Sequoia* standard. According to the Government, "The settlement negotiated ...serves the valid government purpose of recovering funds for the United States when the most likely result of continuing litigation is that the United States recovers nothing." (Doc. 123 at 13). In conducting its review of the case, the Government has determined that the Relator's theory of liability is flawed and she is unlikely to prevail on her claims. It states that the settlement amount is substantially more than what would be recovered if litigation continued. *Id.* at 14. There is valid purpose in recovering funds and a rational relationship between the settlement and the governmental purpose; thus, the Government has satisfied its minimal burden.

Moreover, the Relator has not shown that the proposed settlement is fraudulent, arbitrary and capricious, or otherwise in violation of the law and there is no evidence or argument that the settlement is such. Rather, Relator argues that the settlement amount is entirely arbitrary, and, if her theory of the case correct, she could presumably be entitled to potential reasonable damages exceeding $20,000,000. She asserts that the fraud goes beyond the one data set and Government is giving SHC a "free pass" by releasing it from conduct without knowing the extent and scope

---

[10]Because I find that the Government has satisfied both standards, it is unnecessary to predict which standard the Eleventh Circuit would adopt.

of the false claims.  (Doc. 125 at 19).  At hearing, Relator argued that the settlement amount is by definition "arbitrary" because it is not based on any mathematical valuation of the false claims and was simply an agreed-upon number to which the Relator originally agreed to with no tether to the number or scope of the false claims presented in the case.

While Relator submits that the settlement could be higher and the scope of the Covered Conduct should be more limited, I cannot agree that the Government's decision to settle this action is arbitrary and capricious.[11]  The Government has explained its decision based on its evaluation of the case and the risks of further litigation, and I find that explanation entirely reasonable and rational.

Although the amount of the settlement is not based on a mathematical formula of the alleged false claims, such is not required.  The $325,000 settlement amount was initially agreed to by Relator (*see* Doc. 84), and the Government subsequently adopted this number as adequate given the circumstances of the case.  There is nothing clearly inappropriate about this decision.

As for the scope of the Covered Conduct, the Government has agreed to the release of claims relating to all changes to the OASIS form made by in-house clinicians from July 13, 2009,

---

[11]The arbitrary and capricious standard is not defined by the FCA.  Looking to the analogous standard under the Administrative Procedures Act (APA), 5 U.S.C. § 706, this standard is "exceedingly deferential."  *Defs. Of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013) (quoting *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996).  "[A]n agency action may be found arbitrary and capricious: where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Id.* (quoting *Miccosukee Tribe of Indians of Fla. v. United States,* 566 F.3d 1257, 1264 (11th Cir. 2009).  The court cannot substitute its judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained.  *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008).

to June 30, 2012 (*see* Doc. 114-1 at ¶ D), not just the M1342 data set as Relator proposes. Although the released conduct does appear to exceed the scope of the Relator's Amended Complaint and encompass other possible fraud under Relator's theory, the broader release language does not render the settlement unreasonable, arbitrary, or capricious. Once again, the Government has adequately explained its decision,[12] and Relator's protestations are unavailing.

**B.**

Next, pursuant to the more burdensome class-action settlement standards, the Court considers whether the proposed settlement is fair, adequate and reasonable, looking to the following factors: (i) the likelihood of success at trial; (ii) the range of possible recovery; (iii) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (iv) the complexity, expense and duration of litigation; (v) the substance and amount of opposition to the settlement; and (vi) the stage of proceedings at which the settlement was achieved. *See Bennett*, 737 F.2d at 986.[13]

In considering these factors, I am mindful that determining the fairness of a [class action] settlement is a discretionary decision for the trial court, though it should be "informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the

---

[12]As stated by the Government, "The 'covered conduct' was designed to be limited to claims arising from the Relator's theory of liability: the submission of claims altered by in-house clinicians without the approval of field clinicians. The time period for the 'covered conduct' begins with the Relator's first date of employment and ends with the Defendant's best estimate of when the switch from the HealthWyse software to the Home Care Home Base software was complete for all of the Defendant's facilities, approximately one year after the change begin in June 2011." (Doc. 123 at 8–9).

[13]There is no argument or evidence that there was fraud or collusion in arriving at the settlement.

essence of settlement." *Id.* at 986 (citing *United States v. City of Miami*, 614 F.2d 1322, 1344 (5th Cir. 1980)). "Settlement is generally favored because it conserves scarce judicial resources." *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). Moreover, "the judge must guard against the temptation to become an advocate—either in favor of the settlement because of a desire to conclude the litigation, or against the settlement because of the responsibility to protect the rights of those not parties to the settlement. In reviewing the settlement the judge is called upon to be impartial and neutral, favoring neither the proponents of the settlement nor those who are opposed or absent." *Id.* (quoting Moore's Federal Practice, *Manual for Complex Litigation 2d* § 23.14 at 160 (1986)).

To the extent the *Bennett* class action settlement factors can be applied to this FCA case, each is discussed in turn.

### i.

It is important to note that consideration of the likelihood of success should not amount to a determination of the case on the merits. As the Fifth Circuit has explained, "[t]he very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) (quoting *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960)). Further, "[i]t cannot be overemphasized that neither the trial court in approving the settlement nor [the appellate court] in reviewing that approval have the right or the duty to reach any ultimate conclusions on the

issues of fact and law which underlie the merits of the dispute.  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (citing *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 456 (2d Cir. 1974), *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975)).  Where a substantial question exists regarding the likelihood of success at trial, this factor weighs in favor of approving a proposed class action settlement.  *See, e.g., In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323, 1330–31 (S.D. Fla. 2001).

The likelihood of success at trial is, to say the least, a contested issue.  As outlined in detail in their respective briefs, Relator submits that liability is clear while SHC and the Government argue Relator's theory of liability is fundamentally flawed.

As discussed above, Relator brings suit on two counts, accusing SHC of presenting, or causing to be presented, a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(A), and knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim in violation of § 3729(a)(1)(B).  (Doc. 44).  By her theory, SHC violated the FCA because SHC knew field clinicians had the final say prior to submitting OASIS reports and the in-house clinicians changed their entries without obtaining the express approval of the field clinicians.  She points to the testimony of SHC employees Sheryl Mims and Tim Henderson, who testified that they would frequently change OASIS answers without the express consent of the field clinician.  This practice, she argues, was clearly an act of deliberate ignorance

18

of, and reckless disregard, of SHC's own written policy and the applicable regulations,[14] and thus a submission of a false claim as a matter of law.  (*See* Doc. 125 at 13–18; *see also* Doc. 69).

SHC and the Government counter that the practice, even if violative of SHC's written policy, does not compel the conclusion that any false claim was presented.  In other words, they argue that the mere fact that the in-house clinicians changed the field clinicians' responses does not merit a finding a falsity to support an FCA violation.  They point out that the Regulations do not require the HHAs to transmit data exactly as submitted by a field clinician, even if incorrect.  And, they argue that the review process by the in-house clinicians was designed to correct errors by the field clinicians before the information was submitted to CMS.  As such, they assert that Relator has failed to identify any knowingly false claim and her theory does not support the same.

It does appear to the undersigned that there are substantial hurdles that affect Relator's likelihood of success.  Most significantly, she stakes her claims on the theory that any change made by an in-house clinician without the express knowledge or approval of the field clinician is a violation of the electronic reporting requirement of 42 C.F.R. § 484.20, and thereby constitutes a false claim within the meaning of the FCA.

It is axiomatic that the submission of a false claim is the "*sine qua non* of a False Claims Act violation."  *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002).  "The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts,

---

[14]She cites 42 C.F.R. § 484.210(e), which states, "An HHA must submit to CMS the OASIS data described at § 484.55(b)(1) and (d)(1) in order for CMS to administer the payment rate methodologies described in §§ 484.215, 484.230 and 484.235."  *See also* 42 C.F.R. §§ 484.20; 484.250(a).

the provider knowingly asks the Government to pay amounts it does not owe." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir.1999)). Improper practices standing alone are insufficient to state a claim under either § 3729(a)(1) or (a)(2) absent allegations that a specific fraudulent claim was in fact submitted to the government. *United States ex rel. Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005), *cert. denied*, 549 U.S. 810 (2006).

Although SHC may have violated its own internal policy of requiring express approval from the field clinicians, such does not necessarily imply that SHC knowingly or recklessly submitted a false claim within the meaning of the FCA in any instance. Moreover, Relator faces an uphill battle in presenting evidence that the submissions were indeed false[15] and that SHC knowingly submitted them as false. Given these disputes over the threshold questions of liability and falsity, Relator's likelihood of success at trial is not at all certain in this case.

The legal and factual challenges presented in this case are hardly insignificant, and they provide a compelling reason to approve a settlement that provides at least some relief. Due to the significant risks in taking this case to trial and a considerable chance that Relator and the United States could recover nothing, this factor weighs heavily in favor of settlement approval.

**ii.**

In considering the range of possible recovery, the focus is on the possible recovery at trial. *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 212. The FCA provides for civil

---

[15]Both sides have retained expert witnesses to testify whether or not the changes indeed corrected errors made by the field clinicians or if the changes amounted to incorrect submission that resulted in a higher payment from CMS. Such matters are beyond the scope of this Report and Recommendation, but the factual dispute does certainly create doubt as to whether Relator can satisfy her burden to prove falsity.

penalties between $5,500 and $11,000, "plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(9).

As argued by the parties, possible recovery in this case appears to be between $0 and $20 million.  The Government and SHC contend that the possibility of zero recovery is entirely likely given their view of the flawed theory of liability and lack of supportable false claims.  Relator submits that a possible judgment on the two claims she asserts are admitted would be approximately $20,000.  (Doc. 125 at 22–23).  She admits that a $325,000 settlement would be fair and reasonable for the M1342 claims from SHC's Clearwater office, but opines that the possible recovery in this case could exceed $20 million with "minimal expansion of the discovery."  *Id.* at 23.

Despite Relator's speculation about what further discovery might reveal, based on the evidence of record the possible recovery appears significantly lower.  Indeed, as conceded by Relator, a trial on the number of claims Relator currently has in discovery would not produce a verdict in excess of $325,000, but more like $20,000.  The substantial likelihood is that a trial on the merits as the case now stands could result in a judgment of $0 to $20,000.  As such, I find the settlement amount eminently reasonable and certainly within the range of the possible recovery.

### iii.

As for the third factor, the settlement amount is not unreasonably low in light of the risks inherent in litigation and the difficulties presented in this case.  Quite simply, for the reasons discussed above, the settlement amount proposed here appears reasonable and well within the range of possible recovery.

**iv.**

This action was filed in December 2013 and was actively litigated until administrative closure in June 2016.  For the approximately two-and-a-half year period prior to administrative closure, motion practice was not inordinate.  Relator had filed a motion for partial summary judgment as to liability (Doc. 69), which remains unresolved.  Upon my review, the factual and legal issues presented do not appear overly complex for this type of case, but the case has required a substantial amount of discovery.  Undoubtedly, it has been an expensive undertaking for both Relator and SHC.

If this case were taken to trial and/or if the action were re-opened for further discovery based on Relator's expanded theory of liability on the proposed second amended complaint, significant additional expenses would be incurred.

On balance, while not a significant factor to the undersigned, the complexity, expense, and duration of this litigation support approval of the proposed settlement.

**v.**

In the context of a class action settlement, the percentage of objections by class members may indicate the reasonableness of a proposed settlement.  *See, e.g., Bennett*, 737 F.2d at 986; *Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1328 (S.D. Fla. 2007) ("While a low percentage of objections points to the reasonableness of a proposed settlement, a high percentage of objections signals that a proposed settlement is not fair or reasonable."); *Perez v. Asurian Corp.*, 501 F.Supp.2d 1360, 1382 (S.D. Fla. 2007) (considering the tiny percentage of objectors out of a large member class as weighing in favor of accepting the settlement).  Because there is no class affected by the settlement here, this factor is not easily applicable to an FCA case.  *See*

*Schweizer*, 956 F.Supp.2d at 15 ("This factor is less useful in the context of a proposed *qui tam* settlement, where an objecting relator is a necessary predicate to this very analysis, than in the context of a proposed class action settlement, where the number of objections filed by class members may vary considerably").

However, in weighing this factor the Court notes the existence of substantial sentiment in favor of the settlement by the Government and SHC. Given that the United States is the real party in interest and the primary beneficiary of the settlement, the Government's stance in support of the settlement is significant. The Relator's objections to the settlement, while earnestly presented, do not weigh heavily in favor of rejecting the settlement.

**vi.**

Concerning the stage of proceeding at which settlement was reached, "[a] court evaluates the stage of the proceedings at the time of settlement to ensure that the plaintiffs have access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation." *Perez*, 501 F.Supp.2d at 1383 (citation omitted).

The initial settlement in principle between Relator and Defendant was reached on June 27, 2016, just four days prior to the discovery cutoff of July 1, 2016. Although Relator had filed a motion to file a second amended complaint on June 21, 2016 (Doc. 74), which presumably would have warranted an extension of discovery and other case management deadlines, Relator's request was never addressed by the Court and was by no means guaranteed. In any event, the parties in this case had conducted substantial investigation and discovery before the proposed settlement agreement was reached. At the time the Government moved to intervene, the parties had sufficient information to evaluate the merits of the case and weigh the benefits of settlement.

Thus, the stage of proceedings at which the proposed settlement was reached in this matter supports the fairness and adequacy of the settlement.

### C.

As a final matter, the proposed settlement agreement does not resolve Relator's percentage of recovery or any attorneys' fees and costs.

Although recovery in a *qui tam* action belongs principally to the United States, the Relator will generally be entitled to receive a share of the Government's recovery, which ranges from fifteen to twenty-five percent if the United States has intervened, *see* 31 U.S.C. § 3730(d)(1), or from twenty-five to thirty percent if it has not, *see id.* § 3730(d)(2). The Relator's award is paid from "the proceeds" of the suit, *id. at* §§ 3730(d)(1), (2), which may consist of an adjudicated amount or a settlement amount.

Pursuant to the FCA, the Relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." *Id. at* §§ 3730(d)(1), (2). These expenses are to be awarded against the Defendant. *Id.*

While the Court expects the parties are able resolve the issue and award the Relator her fair share and attorneys' fees and costs without the need for judicial intervention, additional motion(s) practice may be necessary. As a result, I find it necessary for the Court to retain jurisdiction until such can be resolved or adjudicated.

### IV.

Accordingly, I **RECOMMEND** that the district judge approve the proposed settlement agreement (Doc. 114-1) as fair, adequate, and reasonable for the reasons outlined above.

I further **RECOMMEND** that Relator, Defendant, and the United States be directed to execute the proposed settlement agreement, with the Court reserving jurisdiction to decide the matter of Relator's share, as well as any fees and costs.

Respectfully submitted this
2nd day of May 2017.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
The Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of record

25